478 So.2d 600 (1985)
STATE of Louisiana, Appellee,
v.
Arthur Lee BROWN, Appellant.
No. 17287-KA.
Court of Appeal of Louisiana, Second Circuit.
October 30, 1985.
*602 Love, Rigby, Dehan, Love & McDaniel by Truly W. McDaniel, Barry G. Feazel, Shreveport, for appellant.
William J. Guste, Jr., Atty. Gen., Baton Rouge, Paul J. Carmouche, Dist. Atty., Powell A. Layton and John A. Broadwell, Asst. Dist. Attys., Shreveport, for appellee.
Before HALL, C.J., and JASPER E. JONES and LINDSAY, JJ.
JASPER E. JONES, Judge.

FACTS
On the evening of March 26, 1983, Charles Moss left his home in north Shreveport to have a prescription filled for his sick wife. After having done so, he stopped at a Wendy's drive-in restaurant on North Market Street. While there he was abducted by the defendant-appellant, Arthur Lee Brown, and two co-conspirators, Terrell Porter and Gregory Means. The three co-conspirators drove Moss to a secluded area and proceeded to rob him at gunpoint of $5.00. Moss attempted to escape his abductors. In the struggle to do so the gun discharged, striking Porter in the shoulder. Nevertheless, Porter and Brown succeeded in subduing Moss. Moss was then stabbed by Porter approximately 35 times with a hunting knife, his body weighted down with cement blocks and dumped into a nearby pond. Brown was stabbed during the altercation. Moss' automobile was then burned almost beyond recognition.
Shortly afterward, members of the Shreveport Police Department responded to a shooting and stabbing call at 1920 Myrtle Street. There, the police discovered Brown and Porter who were injured. The police were informed that their injuries were sustained in a dice game. Police officers noted a great deal of blood on the sidewalk and inside the automobile in which Brown, Porter and Means had ridden to the Myrtle Street address. The police acquired the *603 consent of the declared owner of the vehicle, Ms. Gai Booty, to a search of the interior of the vehicle. At the request of the officers Ms. Booty opened the trunk for them to search. The search produced a pair of men's western cowboy boots, a western style straw hat with a large feather band, and a blood-stained hunting knife. There was fresh blood on the hat, boots and knife. Ms. Booty denied knowledge of these items and disclaimed any ownership of them. She stated they were not there when she loaned the automobile to the appellant earlier in the evening.
Two days later Shreveport police detectives traded information pertaining to the shooting and stabbing incident with other detectives who were working the missing persons case pertaining to Charles Moss. At that time the detectives discovered that the western-style hat found in the trunk of Booty's car was the same hat that was depicted in a picture given to the detectives by Rita Moss, the victim's wife. Appellant, Terrell Porter and Gregory Means were then arrested for the first-degree murder of Charles Moss. On March 29, 1983, Ms. Rai Booty, mother of Ms. Gai Booty, brought the automobile to the police station and signed a release to search the vehicle. Ms. Rai Booty related that she was the true owner and that she had given permission to her daughter to use it on the night of the murder.
On April 14, 1983, a Caddo Parish Grand Jury indicted the appellant for the first-degree murder of Charles Moss. In pre-trial motions, the defense sought to suppress the evidence uncovered in the search of Ms. Booty's automobile on March 26, 1983 and to recuse the district attorney and his assistants as the chief assistant had been an associate of the court-appointed defense counsel. The trial court refused these motions.
During trial the defense objected to the testimony of a physician in regard to his opinion that an effort had been made to decapitate the victim. The defense argued that such an unsolicited remark was beyond the scope of his expertise and inflammatory. This objection was overruled. Defense counsel also objected to the court's refusal to adopt a special jury instruction on the law as it relates to the specific intent to kill or inflict great bodily harm. The judge found that the law in this area was included in his other jury charges.
On September 22, 1983 the jury unanimously convicted the appellant of the first-degree murder of the victim. The jury could not agree that a sentence of death was appropriate. As a result, the trial court, on October 5, 1983, imposed the mandatory life sentence without benefit of probation, parole or suspension. On this date the court also denied the defendant counsel's motion for post-verdict acquittal and a motion for a new trial.
The appellant made twenty-two assignments of error but only argued and briefed the following five, and the remaining assignments of error are considered abandoned. State v. Domingue, 298 So.2d 723 (La.1974); State v. Williams, 338 So.2d 672 (La.1976).
1. The trial court erred in refusing to sustain appellant's Motion to Suppress to the results of the search of Ms. Booty's vehicle on the night of March 26, 1983.
2. The trial court erred in overruling appellant's Motion to Recuse the district attorney because his chief assistant had been an associate of appellant's court-appointed counsel and had even interviewed defendant at one point in he proceedings.
3. The trial court erred in allowing the former coroner, the state's expert witness, to state opinions about ultimate facts and conclusions which should be determined by the jury.
4. The trial court erred in refusing to include appellant's Requested Jury Charge Number One in his charge to the jury.
5. The trial court erred in overruling the defendant's Motion for Post-Verdict Acquittal and for New Trial.
*604 We affirm the conviction and sentence, finding all of the assignments of error to be without merit.

WARRANTLESS SEARCH OF THE AUTOMOBILE
A warrantless search conducted pursuant to a valid oral or written consent is permitted by the Louisiana and United States Constitution. When the state seeks to rely upon consent to justify the lawfulness of a search, it has the burden of proving that it was given freely and voluntarily by a person who possesses common authority or other sufficient relationship with the premises or effects sought to be searched. Voluntariness is a question of fact to be determined by the trial judge from a review of the totality of the circumstances. Factual determinations of the trial judge are entitled to great weight upon appellate review. State v. Ossey, 446 So.2d 280 (La.1984), cert den., ___ U.S. ___, 105 S.Ct. 293, 83 L.Ed.2d 228 (1984); State v. Helsley, 457 So.2d 707 (La.App. 2d Cir. 1984).
The state argues that on the evening of March 26, 1983, the police inquired as to ownership of the automobile and that Ms. Gai Booty stepped forward, declared herself to be the owner, and agreed to a search of the interior. The state asserts that her conduct in opening the trunk for the police, and her prior oral agreement to the search, satisfies the voluntariness test. The state concludes that as Ms. Rai Booty, the true owner of the vehicle, had given Ms. Gai Booty permission to use the automobile, then all requirements for a valid search have been met. The appellant argues that Ms. Gai Booty's consent was not voluntarily given as she was a young girl confronted by an extremely upsetting situation and that she had not the presence of mind, maturity or force of personality to refuse the request of the police.
The record reveals Detective Pat McGaha testified that he responded to the shooting-stabbing call on the evening of March 26, 1983. When he arrived at the scene he inquired as to ownership of the vehicle and that Ms. Gai Booty, a 21 year old female, stepped forward and stated that she was the owner. When Detective McGaha asked if he could search the automobile, she agreed. He concluded by testifying that after the search of the interior was completed he asked Ms. Gai Booty for permission to search the trunk and she then stepped forward and opened it herself. Sergeant L.L. Jackson testified that he also responded to the shooting-stabbing call and was present when Detective McGaha asked permission to search the automobile. His testimony precisely corroborates that given by Detective McGaha. Ms. Rai Booty testified that she was the real owner of the vehicle and that she had given permission to her daughter, Ms. Gai Booty, to use it for the evening in question.
Ms. Gai Booty testified that she did not give permission to search the automobile and that she did not open the trunk for the police. In response to this testimony, the state played a recording of an interview conducted with her by two police detectives three days after the search. The recording established that Ms. Gai Booty admitted giving permission for the search and opening the trunk herself for the police.
We conclude that the trial court was within its discretion in relying on the testimony of the police and denying the motion to suppress the evidence seized on March 26, 1983. At the time this search was made the police were investigating the injuries apparently sustained by Brown and Porter in a dice game. They were totally unaware that a murder had been committed. There is no evidence that Gai Booty knew any facts not known to the officers and there is no evidence whatsoever that Ms. Gai Booty was too emotionally affected by the circumstances surrounding the auto search to give a valid consent. Cf. State v. Ledet, 458 So.2d 1024 (La.App.2d Cir.1984), writ den., 462 So.2d 1263 (La.1985).

MOTION TO RECUSE THE DISTRICT ATTORNEY AND HIS ASSISTANTS
In an action to recuse the district attorney the defendant has the burden of *605 showing, by a preponderance of the evidence, that the district attorney has a personal interest in conflict with the fair and impartial administration of justice. State v. Edwards, 420 So.2d 663 (La.1982). The fact that an assistant district attorney previously represented a defendant in the same criminal matter does not ipso facto require the district attorney and other members of his staff to be recused. State v. Bell, 346 So.2d 1090 (La.1977). The law presumes that the attorney will respect a client's confidences and where counsel is not called upon to use against a former client any confidential knowledge gained through their former association, then no prejudice can result. State v. Brazile, 231 La. 90, 90 So.2d 789 (1956); State v. Bell, supra. The fact that an assistant district attorney takes affirmative action in removing himself from any participation in a conflict of interest posture with a defendant has been deemed a controlling consideration in determining not to recuse the district attorney and his other assistant district attorneys. State v. Edwards, supra.
The district attorney's chief assistant, Mr. A.M. Stroud, III, had at one time been employed by the same law firm as one of the appellant's court-appointed attorneys. Mr. Stroud had assisted his co-employee by conducting interviews of the appellant prior to his employment with the district attorney's office. The appellant contends he has been prejudiced by this connection which the district attorney now has with an attorney who had earlier participated in representing appellant in this case. He contends this inherent unfairness could only be removed by the recusation of the district attorney and all his assistants.
The record reveals that Mr. Stroud is presently the first assistant district attorney for Caddo Parish with supervisory responsibilities for the other attorneys employed by the district attorney. Prior to assuming this position he was an associate in the law firm of Blanchard, Walker, O'Quin & Roberts located in Shreveport, Louisiana. Another attorney employed by the firm, Mr. Jay Pierson, was appointed by the court to represent the appellant. Mr. Stroud gave Mr. Pierson some assistance in preparing the appellant's defense. Mr. Stroud characterized this assistance as at least one interview with the appellant, some strategy discussion and varying degrees of help in preparing two or three motions filed in the case. Mr. Stroud concluded that he informed the district attorney of this involvement with the appellant's case when he was initially hired and the decision was then made to completely divorce himself from this prosecution. The record also reveals that Mr. Stroud has not discussed any aspects of his former relationship with the appellant with the attorneys prosecuting the case or with any other member of the district attorney's office and has not retained any notes or other documentation from his former law firm on the appellant's case.
We conclude that the trial judge correctly refused to recuse the district attorney and his other assistants as the appellant presented no evidence whatsoever that Mr. Stroud revealed any confidential information that he had been privy to in his former association with the appellant, nor was any conflict shown that would impair the fair and impartial administration of justice. Mr. Stroud's mere presence as a first assistant district attorney does not satisfy the legal requirements to recuse the district attorney and his other assistants and this assignment of error is without merit.

UNSOLICITED OPINIONS BY THE MEDICAL EXPERT
A physician testifying as an expert may properly give an opinion as to the probable manner in which a wound or other traumatic injury was inflicted where such testimony is based on facts within the expert's knowledge. State v. Beck, 445 So.2d 470 (La.App.2d Cir.1984), writ den., 446 So.2d 315 (La.1984). A witness may draw natural inferences from facts personally observed by him. State v. Clay, 408 So.2d 1295 (La.1982).
The record reveals that Dr. Robert E. Braswell was accepted by the court as an *606 expert in examining bodies and determining causes of death. Dr. Braswell had served as the Caddo Parish Coroner from 1976 until 1983 where he had occasion to conduct over 2,000 autopsies. During the course of the trial Dr. Braswell testified:
Q. Doctor, in the internal examination that you conducted on the body, did you have occasion to actually go into the neck area?
A. Yes. This area was dissected and in the neck area, there was the laceration in the right side of the neck. The jugular veins were involved. It did not involve any major arteries in the right side of the neck. In the section of the back part of the neck, where there were multiple wounds forming a conglomerate wound, as previously described, and these penetrate the intervertebral space; that is, the space between the vertebra and the upper cervicalin the upper part of the neck. It went in between the vertebral bodies, exposing the substance of the spinal cord.
Q. Okay.
A. It appeared that an attempt was made to remove the head from the body.
An objection by the appellant was overruled by the trial court.
The appellant argues that the statement amounts to reversible error as it concerns Dr. Braswell's opinion as to the ultimate issue to be decided by the jury.
We do not agree. The doctor was merely stating his opinion as to how the injury was inflicted. State v. Beck, supra. We have viewed State Exhibits S-34, S-38 and S-41, photographs of the particular wounds Dr. Braswell was describing, and conclude the natural inference that even a lay witness could have drawn from observing the cuts on this area of the victim's body was that an effort had been made to remove the victim's head. State v. Clay, supra.
The trial court was correct in overruling the motion by the defense counsel and this assignment of error is without merit.

TRIAL COURT'S REFUSAL TO ADOPT APPELLANT'S SPECIAL JURY INSTRUCTION
A requested jury instruction shall be given by the court if it does not require qualification, limitation, or explanation and if it is wholly correct and pertinent. LSA-C.Cr.P. art. 807. Requested instructions which are substantially given and covered by the trial court's general charge are properly refused. State v. Birdsong, 452 So.2d 1236 (La.App.2d Cir.1984), writ den., 457 So.2d 1200 (La.1984). The refusal to give a requested special charge does not warrant reversal of a defendant's conviction unless it prejudices substantial rights of the accused. LSA-C.Cr.P. art. 921; State v. Beck, supra.
The appellant argues that his jury instruction request number one is a correct statement of the law, that it was not included in the trial court's general charge to the jury, and that the court was clearly wrong not reading it to the jurors. This instruction concerned the necessity to find that the appellant had the required intent to commit murder and that his mental state could not be inferred from the actions of a co-conspirator.
The record reveals that the trial court's general jury charge correctly and clearly defined specific and general criminal intent and properly related that the jury must find that the appellant had the specific criminal intent to kill or inflict great bodily harm. The court's general charge also correctly defined a principal of a crime and instructed the jury that the appellant could be guilty of first degree murder as such. The general charges substantially relate that the appellant's required mental state must not be inferred from any other individual's conduct. This is clearly evident by the fact that the trial judge instructed the jury that they must find that "... this defendant acted with a specific intent to *607 kill or inflict great bodily harm." [emphasis added]
We conclude that the general jury charge properly incorporates the appellant's requested instruction and that no showing has been made that substantial rights have been denied him.

MOTION FOR POST-JUDGMENT ACQUITTAL AND FOR A NEW TRIAL
The appellant asserts in support of these motions in brief that there is a complete lack of evidence in the record proving any participation by Arthur Brown in the murder of Charles Moss.
A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the prosecution, is insufficient for a rational juror to conclude that the essential elements of the crime were proven beyond a reasonable doubt. State v. Byrd, 385 So.2d 248 (La.1980); Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); LSA-C.Cr.P. art. 821. Where a conviction is based upon circumstantial evidence the test is whether, after viewing the evidence in a light most favorable to the prosecution, a rational juror could have concluded, beyond a reasonable doubt, that every reasonable hypothesis of innocence had been excluded. State v. Hammonds, 434 So.2d 452 (La.App.2d Cir. 1983), writ den., 439 So.2d 1074 (La.1983). A motion for a new trial shall be granted when the court finds no evidence to support the verdict. LSA-C.Cr.P. art. 851(1); State v. Hudson, 373 So.2d 1294 (1979); State v. Gonday, 442 So.2d 703 (La.App. 1st Cir.1983). The prior inconsistent testimony of a witness is relevant only to his credibility and is not to be used as substantive evidence of guilt. The defendant is entitled to a limiting instruction regarding the use of the statement, but must request such an instruction from the court. The failure to request the instruction limiting the consideration of the testimony to the issue of credibility is deemed a waiver of any subsequent objection that the testimony was considered on the issue of guilt. State v. Williams, 445 So.2d 1171 (La. 1984).
The record reveals that the state called Gregory Means as a witness. Means was an eye witness to the circumstances surrounding the crime and his testimony was very damaging to the appellant. During his testimony, the witness denied that the appellant had assisted in killing the victim. At that point his testimony was impeached in accordance with LSA-R.S. 15:487[1] and 15:493[2] with a statement he previously made to the police. In this prior statement he related that "... they got to wrestling and they got the man down ..." and "... they got in a fight, and they got the man down ...," referring to the appellant and Terrell Porter. The witness then admitted making these statements. The objection by the defense counsel, which was properly overruled because the state had the right to impeach the witness, contained no request for a limiting instruction to the jury, nor was a limiting instruction subsequently requested. For these reasons the defendant's objection to the jury's consideration of Means' statement, implicating the appellant directly in the murder, is waived.
*608 Gregory Means also testified that the appellant (1) agreed to participate in robbing someone for money to buy wine and cigarettes; (2) drove the victim's automobile to the pond after participating in the abduction at Wendy's; (3) aided in subduing the victim as he tried to escape; (4) received a stab wound as a result of the killing of the victim; (5) assisted in disposing of the body and in concealing the crime scene by scattering leaves over the blood upon the ground; (6) drove Ms. Booty's automobile to procure gasoline with which to burn the victim's vehicle; and (7) agreed to participate in a lie where the police were told that he was injured as a result of an altercation in a dice game.
The review of Means' positive testimony reflects that the state presented far more than the witness's prior inconsistent statement upon which to base the conviction. State v. Hammond, supra. The record establishes that the police were unable to find any evidence of a crime scene where the appellant claims he suffered the stab wound, all as described by him in a recorded statement played to the jury at trial. Also, the victim's clothing was discovered in the trunk of the automobile that appellant borrowed from Ms. Booty. This clothing contained blood stains consistent with the blood type of the victim. The automobile also contained a hunting knife stained with blood which was consistent with the victim's blood type and with the appellant's blood type.
The evidence presented in the record, when viewed in a light most favorable to the state, is sufficient for a rational juror to conclude that the essential elements of the crime were proven beyond a reasonable doubt and that every reasonable hypothesis of innocence had been excluded. The trial court was correct in denying the appellant's post judgment motion for acquittal and the motion for a new trial.

CONCLUSION
All of the appellant's assignments of error are without merit and the conviction and sentence are AFFIRMED.
NOTES
[1] R.S. 15:487. Impeachment of own witness

No one can impeach his own witness, unless he have (sic) been taken by surprise by the testimony of such witness, or unless the witness show hostility toward him, and, even then, the impeachment must be limited to evidence of prior contradictory statements.
[2] R.S. 15:493. Foundation of proof of contradictory statement

Whenever the credibility of a witness is to be impeached by proof of any statement made by him contradictory to his testimony, he must first be asked whether he has made such statement, and his attention must be called to the time, place and circumstances, and to the person to whom the alleged statement was made, in order that the witness may have an opportunity of explaining that which is prima facie contradictory. If the witness does not distinctly admit making such statement, evidence that he did make it is admissible.